## Case No. 13,154.

### SNYDER v. MUTUAL LIFE INS. CO.

[3 Ins. Law J. 579; 4 Bigelow, Ins. Cas. 424.]

Circuit Court, E. D. Pennsylvania. May 6, 1874.[1]

INSURANCE — LIFE — CONDITIONS — SUICIDE — How
DETERMINED — REPRESENTATIONS — AN-
SWERS TO QUESTIONS.

1. The policy contained the condition that if the insured died by his own act or hand, whether sane or insane, then the policy should be null and void. *Held*, that the plaintiff was bound by the condition of the policy, and if the jury believed that the insured died by his own hand, whether sane or insane, the plaintiff cannot recover.

2. It was a question for the jury to consider and decide, whether the insured died by murder or suicide, and the burden of proving, to the reasonable satisfaction of the jury, that deceased died by suicide, lay with the defendant; otherwise, it was liable.

3. The fact that the insured was induced by the earnest solicitations of agents to take large amounts of insurance, and make semiannual or quarterly payments, is no evidence that he meditated suicide at the time of insurance. The insured left a written memorandum, in which he referred to a policy of accident insurance as a part of an available fund for the payment of his debts. *Held*, that it was for the jury to consider whether this reference was evidence of a contemplated violent death.

4. It was for the jury to consider the facts that the insured expected an early settlement of his policies of insurance, that they would be difficult to collect, that the policy against death by accidents was included in the rest, in determining the question whether the insured meditated suicide.

5. The only answer to the questions in the applications, "Have you ever had a disease or other attack?" "Have you ever had any serious illness, disease, or personal injury?" was, "Smallpox thirty years since." *Held* that if the insured had a fall on the head, and the injury was a severe one, or if he had a severe concussion on the brain, resulting from the fall, the answer is untrue, and the plaintiff cannot recover. The answer to the question in the application, "How long since you were attended by any physician, and for what disease? Give the name and residence of such physician"— was "Not for twenty years." *Held*, that if the insured, about five years previous, had a severe fall on the head, and was attended several times by a physician, though employed by a railroad company, which is the same in law as being employed by the insured, then the answer is untrue, the policies are void, and the plaintiff cannot recover.

At law.

CADWALADER, District Judge. Gentlemen of the jury: On the morning of Saturday, the 22nd of February, 1873, at about seven o'clock, two men, driving a wagon across the Monocacy bridge, just at the entrance from the railroad depot, toward Old Bethlehem, saw in the water of the Monocacy creek, as they crossed the bridge, something which they looked at, and discovered to be a dead body; and one of them had seen at just the same place. a few weeks before, the dead body of another man, Louis Conner, who was murdered, as was reported, and, it

seems to have been assumed, in that neighborhood. It is conceded to be impossible that the body could have been where it was found through any simple accident, without some effort of will of a human creature. There is a difficulty, which we will consider more particularly hereafter, in comprehending how the body could have been where it was found without some other agency than that of the dead person in his lifetime. The stream had not force enough to move it, even if the fall had been in the water, but the weight of probability is that the fall was in a dry place, and not in this shallow stream. The body was from 20 to 25 feet—I think you will safely say, from the evidence, at least 22 feet— from the nearest point which it could have reached from the bridge. Now, it lay there until, as I said, some time, which, according to the best evidence, I think, must have been between ten and eleven o'clock, when a person, with the assistance of the coroner, got it out upon the bank of the creek,—the Monocacy,—and there it was ascertained to be the body of Monroe Snyder, a citizen of good standing in Bethlehem, a man of whom the most undisputed account is that at a quarter past nine, in the evening before, when he was in apparently good health and spirits; during this period of some thirteen hours, more or less, we have accounts which, according to one side or the other of the contention of the parties, may refer to him, until a short time after two o'clock, supposing him identified sufficiently by the witnesses whose testimony we will have to consider hereafter; but from the time before three o'clock until the body was seen, at seven o'clock, I suppose, at least four hours, we have not even the obscurest evidence, or ground for conjecture from any distinct fact. Now, then, when the body was examined, there were four wounds, one a mortal wound, on the head, from which it seems to be fairly agreed that he died from suffusion of blood upon the brain, caused by a severe blow. That mortal wound and the three wounds from an instrument which the surgeons think was not sharp-pointed, but of the knife kind, these three wounds were not mortal; that is to say, though they might have caused inflammation from which death would have ensued, that could not have occurred probably for days; but the earliest time is said to be eighteen hours, and that is much under the time that the other surgeons indicate; probably for two or three days, if not much longer, these wounds were not necessarily mortal; even then may not have caused death. The exact character of the wounds,—these three wounds,—much as it has been discussed by the counsel, and extended as the testimony is from surgeons, we know very little of. They were on the belly. in the neighborhood of the navel, one a little above, and the other below, and one moving upward and inward, and the other downward and inward, and the third not so

---

[1] [Affirmed in 93 U. S. 393.]

distinctly described, and apparently more trifling. These three wounds appear to have been about the same width at the bottom as at the place where the instrument inflicting them entered the body, and I do not think there is any reason to doubt, from the testimony, that one of them at least had penetrated the peritoneum, but they were very shallow cuts, and the measure of the little finger seems to be the greatest length attributed to them. They were very shallow cuts, and so shallow that the one which penetrated the peritoneum must have barely penetrated it. They took it for granted that it was murder at that time, and perhaps it may not be wholly unimportant, in that stage of the cause, that they did, but I am not now discussing that. They all took it for granted that it had been a murder. No idea of suicide then entered anybody's mind, and this remarkable fact is undisputed: That, when they stripped the body to examine these wounds, they put the inner red shirt, the outer white shirt, and the drawers under the head, which lay upon them so as to saturate them with blood. That occurred almost immediately after the examination, and after that, of course, no inspection of the clothing would help us. Now, gentlemen, it is very unsafe here even to argue about probabilities; the most improbable things are sometimes true, and the most probable things sometimes don't happen; but if you go for mere probabilities, if the murderer stabbed this body after death, it is very strange he did not cut deeper; if, on the contrary, the wounds were inflicted during life, either by the murderer or by a suicide, there is no difficulty in finding just such little wounds as these. If a man stabs himself, he will very likely shrink from cutting deep, and if a man stabs another he must do as he best can, and though the counsel put themselves in a fencing rather than in a forensic attitude, in discussing the question, it would be arbitrary to adopt any conclusion of probability, except in the event of death; but, if death had occurred before these wounds, you will say whether it will be very probable that the murderer would not have struck more deeply into his victim.

Now, these are the external aspects of the case, as it was exhibited at the coroner's inquest on post mortem examination. Whatever may have been thought then, and we don't know, and I don't see as we need care, there was further investigation, supposed or actual further developments, and there arose a very natural difference of opinion whether this death had occurred through murder or suicide; the theory of accident not seeming to be adopted by anybody, and I don't think being reasonable. How the body got where it was seems to have been a matter of immediate attention; and of continued thought and observation; and what motives were attributable to the deceased man in case of imputed suicide was also a matter of considerable thought. It is not surprising that two parties—that conflicting opinions—arose in the community, even if it had been a larger one; and there seems to have been a difference very soon arising. I say that because some of the witnesses appear to have had a theory on one side or the other of the question. A difference of opinion naturally arose, I say, whether this was murder or suicide.

Now, this deceased person, Monroe Snyder, had effected certain insurances, on three of which, for the sum of thirty thousand dollars, this action is brought. It is admitted that the insurance was made. It is admitted that the premiums were paid, or what is equivalent, accepted. It is admitted that the man died on the day in question. It is admitted that due proof of death was made, and the admission is such as to dispense with the exhibition of the proof, and all these admissions are made in what are technically called the pleadings; that is to say, the written declarations of the parties and the defendant. The insurance company alleges that the insured died by his own act, and the policy, by its express terms, is null and void if he died by his own act or hand, whether sane or insane; and the defendant asks me to give you instruction in a point of law,—that each of the policies sued on was issued to and accepted by the insured with the express condition and agreement that if the insured died by his own act or hand, whether sane or insane, then the policies should be null and void; and I am asked to say to you that, if you believe on the testimony that Monroe Snyder died by his own act or hand, then the plaintiff cannot recover anything for any of the policies, except the premiums paid upon the policies, to wit, a certain sum of money. I affirm that proposition, and give you the instruction as requested. It is admitted that the defendant has assumed and taken on itself the burden of proving that theory to your reasonable satisfaction, that this man died by his own act or hand,—in other words, that the death was caused by suicide; and the question or questions whether the evidence is incompatible with the contention on either side,—on one that it was suicide, and on the other side that it was murder. If the evidence is incompatible with one and compatible with the other theory, of course, your verdict will be found without difficulty, if you reach that conclusion. But it is difficult to find any such simple view of the case justly, and it becomes necessary to weigh opposing theories one against the other; then you are to make an effort of reason to assume the different contingencies that are to be considered, to say how one or the other is compatible, or more compatible, with murder or with suicide,—what the difficulties are of adopting the opposing theory; and in doing so, gentlemen, you are not (I undertake to give you advice in the matter justly, not mine) to get rid of your duty by sheltering yourselves behind

a doubt. There should be a plain, manly effort to resolve doubts, and when a doubt is once resolved, as I have often said in this court, it is no longer a doubt. It is our duty to grapple with doubts, and to resolve them if we can, and not to say, "Oh, that is a doubt, and I will find it in a particular way, and get rid of all difficulty and a solemn duty." You will have to grapple with several in this case, gentlemen; try to resolve doubts to the best of your ability. If finally you cannot resolve doubts, and the case is so obscure that it cannot be cleared up, then you may at least consider upon whom the burden of proof lies, and, if there is a failure of that party to relieve itself of the burden of proof, then it may become your duty to find a verdict upon that ground; but it is the very last standard of duty which ought to govern your consciences.

The insured is described in the policies as a retired merchant. We have no account of his business before 1866, when he had an agency for a slate company, and since that time we have some evidence of how he was engaged, and it is reasonable from the description of him in the policy, and the other evidence, to assume that he had some years before retired, with what may then have been supposed a competency. Now, if Monroe Snyder retired before the Civil War with his competency, say a dwelling-house with a stable and a one-horse carriage,—large double dwelling-house,—able to fit his son out in the neighboring apothecary establishment, and perhaps worth, if clear of incumbrances, $16,000 or more, as it is alleged, with what investments we do not know, he might have been living very comfortably, and have found a sad change when the expenses of living were doubled; and it is not surprising, if the increase of expenditures was leading a gradual diminution of capital and income, that this gentleman should have resorted to speculation to make up the deficiency, and in a letter or confidential writing to his son, which he left behind him, and which I shall quote often as I proceed, he says to the son: "You know that I always tried to do the best I could, but oftentimes where I thought I could make something, I lost." He seems to have, in other words, entered into speculation. He appears to have been a kind-hearted man, irresolute, and easily influenced by others; the same letter shows that. He says: "Don't do as I have done; don't let people talk you into anything, to go security, or indorse notes to the banks, and all sorts of such things." Then he says: "Whatever you do, don't let people belie you, or lie you in things as they did me." I suppose he means, "lie you into speculations"; that is my judgment of the meaning, from what he says. "Do the best you can, but never go security for anybody, nor ever indorse a note for no man, no matter who he is. If you manage right, you can get along without asking anybody to go security

for you, or to indorse for you." Then he warns him against speculating in corporation stocks: "Keep out of these companies, for it is worth nothing to be in these large companies. Be very careful that you don't get cheated so much, and don't let people take you into all these things." Then again: "If anything should happen to me, sell my interest in all those iron mines or ore leases; it is too expensive, and very risky business; and don't listen to what other people tell you, and tend well to your store." Then he says again: "Stay out of these companies; never go in a company of no kind, for it is worth nothing to be in these companies; but you are old enough to look a little ahead; and don't spend much money on them iron ore leases; if you can get a little something for them, sell; and, if not, let them run out, and don't spend much money on them, for it's very risky business—lottery business, as Mr. Jacob Herstand said." There is a good old German name, gentlemen. Then he says: "So now, Lewis, keep out of these things, as I told you often." That passage struck me. It seems that he had then had such conversations with his son. "As I told you often, because it is worth nothing; this mining is very risky business; don't spend any money on them leases what I hold; if you can get anything for them, sell them, if not, let them run out,—particularly the one at David McCrea's, where Tinsman is interested, for I don't think he is much better than Lynn, and Coffin is about the same, and if you are a partner you are in for the debts if she makes any." This writing corroborating all, he remarks: "I will try and get you out of all these things, and stay out. If I do something I will do it alone hereafter."

Now, gentlemen, I have read these passages because they give you a sort of biography or history of this man, and the ordinary result, I think, appears in the inventory of the estate after his death,—that his available funds had been diminishing, while his speculative investments were increasing. He says: "If I could"— This is the ordinary result, I think,—what I am about to read,—of speculation to retrieve diminished capital and income. He says, "If I could turn things into money, what I would like to sell, I could shift it around; but there is no sale for nothing at present." Thus he was going behind-hand, and unless he could make profits out of these speculations; at least, it is not for me, but for you, to say whether that is the proper meaning of the letter. In the meantime, what had he done? He had insured his life, and he says of that—and he writes, 1 think, like a simple-hearted, natural man—he says, "I am insured too much; it costs me too much to keep it up, or to pay the premiums, but I am in now; I will keep it up if I can." He says for that purpose— that is, to pay the debts—"I insured so much that all my debts can be paid." Now, gentlemen, this was not after the old fashion

of Bethlehem; it was incongruous to the locality and with the olden time, and it was entirely incongruous with the educational opinions or feelings, if I might so state, of the deceased man himself. There are some curious traits of the old German, hard money, economical feeling, by which he would have liked to have made the rule of his conduct, and I will remind you of what no doubt attracted your attention. He had a safe, as you recollect; it has often been referred to. Now, in that safe it appears that there was money which he had put apart, belonging to two deceased children. There was gold $115, silver $91.33, making $206.33, and the safe was worth $40; and here was a gentleman whose debts and assets are discussed by units of ten thousand dollars by counsel, and twenty, thirty, and sixty thousand dollars of insurance, and so forth. Now, he writes to his son Lewis, "Keep that safe, and the gold and silver money what is in the safe; keep that without fail." Then he repeats: "Don't let that safe go to strangers; keep that, and keep the silver and gold money which is in it,—the $206.

Now, gentlemen, there is another thing showing the old-fashioned way of this man, as he probably was when he became a retired merchant, expecting it to be enough for his old age. His son, you recollect, he set up in business,—at least, that is the fair inference from the evidence. Now, as I understand the passage in this letter, when that son was able to pay to the father the advance, he paid it, and the father gave him a receipt for it, and when the father, expecting to die insolvent unless his affairs were retrieved, referred to that transaction in this letter, he was afraid the creditors might consider it a defense, and he refers the son to the receipt. He says: "You will also find a receipt for your stock in the drug store, so you can hold that; perhaps my creditors might try to get hold of it; that shows that you paid me for it." Now, I read that naturally, not as anything wrong, or as anything the creditors would have a right to take hold of, but as what creditors through mistake think they had a right to take hold of; and he says: "You have paid me for it, and there is the receipt." So here was this old-fashioned, hard-money man, who kept his son in good habits of not squandering advances, but keeping to quaint, economical ways while he was making money, found himself involved in a vortex of speculation, and what was, to his good old German notions, an awful state of things to contend with. That is the way I look at his condition. It is for you to say whether it is correct. It may not have been so bad. It is very probable that his condition was not anything like as bad as he thought, if the arguments of counsel and the evidence are correct; but, as he looked at it, it was embarrassed. The counsel for the plaintiff, on the contrary, say that this only meant that he was afraid that the property

would be sacrificed, and that then the life insurance would be necessary to prevent it, and so forth. The jury will say.

Now, we have had this deceased man's character assailed most violently on one side, and praised most emphatically and eloquently on the other side. I rather think the arguments are about equally mistaken, gentlemen, and that, like most human beings, he had his faults; they may have been very great faults; and, like most human beings, he had his good qualities, and that the good qualities were commendable, and the faults and weaknesses were to be viewed with indulgence, so far as he was concerned, and with rigidity, for the sake of justice, so far as others are concerned; and that is the view we have to take, or that ought to be taken of most of us after we are dead; and it don't do to assail a man because his standard is not, in one respect, that of the highest, nor to praise him to the skies in other respects. He seems to have had an unassailable point of self-respect, if we are to judge of the memorials he has left behind.

Then he had another matter in charge, for which he was very much to blame, but that is not the question under trial here. He had used—what at the time probably was not a very large amount—the money of three young women to whom he was guardian; he had kept the accounts carefully, and we have every reason to believe faithfully, as to the mere writings, and they were in the safe, showing exactly what he owed; but he had used the money, and he was technically in the relation —counsel say he was morally in a worse relation—but, as I stated, we are not trying him for that. Now, he had a strong desire to see justice done to these people. The amount of his deficiency we know exactly; for Owen Beil's child, as he calls her, he was, with interest, $2,303.89, in arrears; and for Louis Berkerstock's two little girls, $949.93; making, say, $3,249.82.

Then, again, gentlemen, there is what I think deserves attention: He had, no doubt, stated in these policies,—there is some evidence of it, I think, in the letter, and he had observed on this probably as of more importance in another relation than appears yet. He observed in these policies that the money was payable, for he had so made it, to his son and wife, respectively. You recollect the form of the policy. Now, he seems to have been afraid these creditors would not get that money from the form of the insurance, and this was a thing he did not mean to permit, if he could help it. He meant that these insurances should go first to pay his debts; that is part of the case; that is of twofold importance, not merely for the introductory purpose I am citing it for now, but for an arbitrary purpose. He says: "Pay all my debts, for I borrowed some money to pay the premiums on the insurance, so that my creditors could perhaps get hold of insurance, and, if they could not, pay all my debts, and be a man, so that nobody can say they lost money

on your father. You can pay all my debts, and hold the property, if you can get the money out of the insurance companies, and have money left. But when you get the money out of the insurance companies, if it ever should happen so, don't think you would keep the money and not pay the debts."

Now, gentlemen, this was the man, and such were his ordinary relations, and I do not think that we can do our duty to this case without, in some measure, looking at these considerations. I don't mean to say that the man did not contemplate suicide, but not at the time and in the manner imputed to him. Let us look carefully at this case, and see whether he meditated suicide, and in the manner imputed to him. The case, as opened by the defendants, was that the deceased made the insurance with the view to suicide,—with the premediation to commit suicide. I think the evidence refutes that wholly. In the first place, that I don't think so much of, for the insurance agents disprove it as far as they can. They say they forced this insurance upon him,—that they tempted him to it. These are not their words, but the substance of what they testified,—that they accommodated him in order to increase the amounts, and if they had not approached him he would not have insured as much as he did; but he appears to have driven a close bargain with them, and have required the temptation of an abatement of $25 from some $500 more or less of premium, and to have had indulgence offered by taking notes. He seems to have required quarterly instead of annual payments, and especially the two insurance agents certainly say that, as a general matter, they pressed the subject on him, and that he generally was reluctant, but I think we have much more conclusive evidence than that. We have to take, gentlemen, this letter, or confidential letter, as a whole; if it is used against him, it must be used for him. Now, you will recollect, gentlemen, that he, in this paper, enjoined particularly on his son to take no advantage of the form of the insurance in order to avoid the payment of the debts, but to be a man, and pay them. Now, the last of these insurances is made payable to the wife. What does that mean? Did he then contemplate suicide with a view to pay his debts, and afterward his family? Let me be understood: This paper was written, the whole of it, after the 13th of January, when the last insurance was made; that is evident from its contents. How it came after, we don't know, except that it was finished the day before he died. Now, after the 13th of January, when the last insurance was effected, he wakes up to this firm conviction that his creditors would not get this money. Did he wish that? On the contrary, he takes every measure that a man can that his creditors may get the money. He therefore would have made that last policy, not in the name of his wife, not

even in the name of his son, but he would have made it in his own name, that his creditors would have got it. Now, I do not know whether you agree with me, gentlemen, but I don't think that it is fair to take that last letter of his, and tear it up, and spit upon it—to use a vulgar expression. He says in that, that the insurances were for his creditors, not for his family. If he had meditated suicide when he wrote that letter and made those policies, the money would have been payable so his executors could have got it for the creditors,—at least, so it strikes me. You will decide for yourselves; but I think this important only for this reason, for the sake of truth. It is, for the decision of the case, of no importance whether he afterward conceived the idea of suicide, or entertained it when the insurance was effected. It is the same thing, in the legal result, but it is important that we should get at the truth, by whatever means, because, if we get upon the path by untruthful means, we get off the track, and don't know where we shall lose ourselves; and for that reason I have thought it my duty, in this painful case, to do justice to this man's memory, for he has an awful account to settle, of debts; and in this respect I think injustice has been done him, and that there is not the least ground to impute to him an intention to take his life when he made the last of these insurances; but, as I said before, that is not, I think, the question. The true question is whether, after that last policy was effected, this man, considering the desperate condition of his affairs if he lived, and the favorable condition to his family if the insurances were received by them, did not conceive, but meditate with more or less of resolution, the thought of taking his own life. If that is made a subject of serious inquiry, and I think, gentlemen, that it is, if you go into probabilities, much more probable that when this simple-hearted man, as I think he seems to have been, found himself in this vortex of difficulties, not able to look his affairs in the face,—when he saw that he had the insurance to this large amount,—that the thought or temptation, or whatever it may be called, may have come into his mind; and that is the inquiry which we must approach with candid and serious thought. Now here the evidence is twofold: First, the letter; and secondly, the occurrences which immediately preceded and followed it. When I say immediately preceded, I say immediately preceded the last stage of it. Gentlemen of the jury, this paper is not, independently of its particular contents, of an extraordinary kind, as I can see, at all. I mean to say that there is nothing surprising in a man's leaving confidential directions to his only son and heir, as to what shall be done after he is dead,—the sort of directions that are not to go into a will. I suppose there are few men in this courtroom, and probably few on the jury, who have not had

large experience of such papers. Men give special directions which don't concern the world at large. I am not now speaking of this paper in particular. I am only speaking of the character of such documents. These are among the most difficult questions that lawyers have to meet,—as to whether such post mortuary documents are testamentary or not. That is to say, they must be proved as such, or may be kept as confidential papers. There is nothing in the direction to keep such a paper secret, unless the confidence. There is nothing extraordinary in all that, that I can see; but, gentlemen, in order to get rid of the prejudice that ought not to attach to the subject, I have made these remarks, because I don't mean to say that the paper is one which you can get rid of in this way, but I do wish a just and proper and unprejudiced introduction to it.

Now, there are two views of this paper called a letter. One is that it was a post mortuary, confidential communication to the son and heir; the other, that it was a letter of one contemplating suicide; and there is a third view, perhaps, that it was partly each, and that it was the production of a man who, though he contemplated suicide, was irresolute in writing it, and afterwards as to executing the purpose. He certainly speaks in this paper of what he was to do if he were to live and go on in the world. He certainly speaks in the other parts of it that he was to go out of the world very soon, with violence. It is, it seems to me, a paper of a man who seems to be vacillating between contending purposes. Now, the parts which I have heretofore read of this paper are principally, if not altogether, consistent with it in one sense, for they bear on the question of insolvency, you recollect; then I shall not repeat them; therefore you will bear that in mind. Now, of the parts which I have not read, there are, we may say, two divisions: One of matter apparently quite innocent, and the other of matter which seems to indicate a purpose to take his own life,—whether a definite resolution, or an indefinite or undefined one, will be for you to consider, if it becomes important.

You have looked, at my request, in the early stage of this case, at the signatures of the three stages of this paper. It is, I think, both from the contents of the papers themselves, and from one of the signatures,—there are three places where it is signed,—evident that this paper was written at intervals. When the first stage of it was penned, nobody can conjecture, except we all know that it was after the 13th of January. Of that fact there can be no doubt. We also know the last of it was finished either on the night of the 20th of February, or the morning of the 21st. Well, now, as I said before, there are a great many matters, any of which are only material on the question of insolvency. There are others, because I do not want to leave any of this paper unconsidered. Here he says:

"Lewis, if God calls me away,"—which we all understand, in German phrase, to heaven,—"If God calls me home, and away from you and mother, you must do the best you can. First of all, be kind to mother, and, whatever you do, see that she is well cared for." Very proper for a letter for his son, gentlemen, after death. That passage about insurance companies I mention in another connection, afterward. Then he says: "About keeping the insurance policies up,—you can do as you please or as you think best." Then he says: "Lewis, I think I told you the Penn Mutual Life Insurance Company holds a mortgage of $5,000 on our house, for which they hold one of my insurance policies for $5,000 as collateral security. I have the paper in the safe which shows it, and the receipts that I paid the premium on it; they also hold fire insurance policy as collateral security, which is transferred to them. You must see that it comes all right. Jonas Snyder holds the fire insurance policy on the drug store building as collateral security for Mr. Taylor's mortgage. That policy is not transferred. I have a receipt in the safe from Jonas Snyder. Lawyer Spout, at Easton, is the agent for the fire insurance company where the drug store property is insured in. Mrs. Reeder, at Easton, holds the insurance policy on your stock as collateral security for the thousand dollars what Shoemaker had loaned of her. Lawyer Reeder attends to her business. So that you can find everything and try to straighten it up, for God's sake." "Lewis, I think"—one of these is in the first stage, the other in the second stage; now I come to what occurs in the third stage— "Lewis, I think it would be best, if something should happen with me, if you would get everything appraised, and sell it." Here, you will observe, gentlemen, what I am about to read changed his purpose. When he wrote the first of these three parts he thought he would keep the property, and pay the debts out of the policies. He, in the third stage,— the third division of the third part,—changed his mind, and, thinking things not likely to be quite as favorable as he thought at first, he thinks they had better sell, and he says: "Lewis, I think it would be best, if something should happen with me, if you would get everything appraised, and sell it." Then again he says: "Lewis, if mother gets money of the insurance companies, if she lives longer than I do, you must take care of it, for she can't; and don't let her lend out, unless you see it. If you put it in a good national bank, I think that is the safest, or take the first mortgage on real estate." Then, gentlemen, he goes on: "Lewis, I settled up everything with Lynn; he is to pay everything we owe over in Jersey." Then he describes his first settlement, and he closes up with Lynn over again: "If anything should happen with me,—I hope it won't, but we don't know, for life is uncertain, but death is certain,—Lynn must pay everything what I

owe for lumber and work, and for hauling the ore, and Kline's royalty and Kline's timber, and everything, before he can get them notes what he left me as collateral security. I also gave him that lease there at Kline's what I had on Henry R. Keuntz's land; otherwise I could not settle with him."

Now, gentlemen, I have detained you with this apparently prosing reading, even of these passages, because I have desired to keep together what is, as far. as the subject goes, just what the man might write confidentially without any unfavorable imputation, but the paper unfortunately contains a great deal more, and I will ask now your attention to the parts of it which seem to import, or may be contended to import, that he intended, or expected, or contemplated an early and violent death. The heads of the argument on this subject are several, one that in which concealment is enjoined. Now, gentlemen, this, I repeat, is unimportant, unless it is made out that there is something to conceal. Merely directions to the son that this paper was not to be exhibited unless there is something in it which gives effect to that direction, I have said, would be dealing very unfairly with what men leave behind them for their families. There is, however, I observe, as I shall read presently those parts of the letter, frequent expressions of apprehension of death,—early death. There is also an indication of doubt as to getting money from the insurance companies. There is also an indication of an early time of anticipated settlement of dependencies, but that is fully assured by other passages which look to the future as though he was going to live. Now, with this long preface, I will read and comment upon the remaining part of the paper: "Lewis, sometimes I feel, and it appears to me that I won't be here with you and mother in this world long any more, but we don't know what God will let happen with us, but we have to submit. I don't hope to get killed or die soon, but sometimes I feel and think that I would not be in this world long any more. Lewis, if God calls me home, and away from you and mother, you must do the best you can. First of all, be kind to mother, whatever you do, and see that she is well cared for." The word "hope" has been commented upon and explained as in this man's natural language, and his family appears to have been German; they seem to have spoken German, as far as we can learn, and the word "hope" in the German parlance, is said to mean nothing more than "expect." You will say what meaning you attribute to it, but it is not to be expected that he would write such a letter that his son would understand that he meant to commit suicide. It would be couched at least so that that would not be exhibited in it. Then he says what is more important: "Lewis, I have my life insured for $65,000 altogether; for $20,000 in the Penn Mutual Life Insurance Company of Philadelphia, and for $30,000 in

the Mutual Life Insurance Company of New York, and for $10,000 I have an accidental policy in the Hartford Company of Connecticut, and $5,000 in the Mutual Protection Life Insurance Company of Philadelphia, which is for the benefit of mother; $5,000 in the Penn Mutual is for mother, and $10,000 in the Mutual Life of New York is for mother. All my other insurance is for your benefit. If anything should happen with me, Lewis, get the money out of the insurance companies, for they have to pay it. The agents of the companies I insured in will assist you." Now there is nothing surprising or evil in his telling his son that he had effected this insurance, and that the son must get the money; but the manner in which the subject is recurred to afterward is important, and the passage I have read is perhaps, in one respect, very important, but that is more for your consideration than for mine. He refers to the whole of the insurance as amounting to $65,000, which he looks to as a fund for the payment of his debts. Now, he includes in that $15,000, as I understand it, or $10,000, as it is admitted, of insurance against accidents. If he did not contemplate a violent death, would he have reasonably considered that as of a part of the available funds of his estate? Now, gentlemen, I don't want to put that as a hair-splitting remark from a lawyer, as it may be regarded, but I want you to look at it as a matter of common sense; would a man who would look to something out of the common course as the cause of death speak of an insurance against accidents in the same category with the insurance that must be paid at all events, and sum them up as one whole, as a fund to pay his debts with? The answer to it, however, is that there was enough without the policy against accident. But is that a satisfactory answer? Don't it still remain that whether there was enough or not he looked upon it as a fund to come into the hands of his executors? It is for you, as a matter of common sense, to say how it strikes you, and you will take it for what it is worth. I have not been quite satisfied with the explanation of it, but you may be. "Lewis, don't show this paper to anybody; whatever you do don't let any person see it; keep it an entirely a secret. If anything should happen with me, sell my interest in all those iron mine or ore leases, it is too expensive and very risky business; and don't listen to what other people tell you, and tend well to your store. The insurance companies must pay the insurance what I am insured; they can't get out of it; if I am gone once, don't let people know for how much I am insured, or how much I am in debt. Keep it as much secret as you can, for not everybody need to know, for it won't make it any better; but when you get the money out of the insurance companies, if it ever should happen so, don't think you would keep the money and not pay the debts."

Gentlemen, the printer has put stops that will mislead you in reading those printed copies,—naturally no fault in it, but this is one of the places: "If anything should happen you can pay the debts and have some money left, and keep all the property what we have, if you manage it right. The agents of the companies will assist you in taking the affidavits for proof of death," and so on. Also: "Lewis, I don't hope or expect to die soon, or get killed; but God only knows, we can't tell; life is uncertain, but death is certain. About keeping Llewellyn's policy up, if he lives longer than I, you can do as you please, or as you think best. Try and keep everything as it is, and as quiet as possible; it is of no use to let everybody know how things are; I know if something should happen with me mother would trouble herself a great deal about it; if it should be the case, take good care of her whatever you do. If the insurance is all paid you can get along right well, and I can't see no reason why they won't be paid, for the premium is all paid on the policies, and the companies are all good companies." One of the premiums was quarterly, and in a few weeks one of the quarterly premiums was to become due. "Mother's money you must take care what she gets out of the insurance companies, for she can't; you must see, too, that you will also find a receipt for your stock in the drug store, so that you can hold that; perhaps my creditors might try to get hold of it, but I don't see how they can if you have this receipt—that shows that you paid me for it. If anything happens with me, settle everything up all right and as soon as you can, and as quiet as you can; the sooner the better. If you sell the houses, let mother buy them, or get a good friend to buy them for her, and she can take the deed and give you the deed again. I think Henry Bell would be a good man to buy the houses for mother; you can't trust anybody, particular no stranger; perhaps if you would try and get Hess to buy it he would not let you have the half, any; if you sell the houses for cash or a short credit, they won't come so high, and you can do that, because you get the money out of the insurance companies. If mother ever gets money of the insurance companies, if she lives longer than I do, you must take care of it, for she can't," and so on.

Now, gentlemen, I have, I believe, read to you, in one connection or another, every word of this paper, and at the hazard of fatiguing you. Now, there was an early time for the expected settlement with the insurance; that he had an idea of some difficulty about it; that he includes the policy against accidents in the sum of the insurance money, are the points of chief importance bearing on the question whether he committed suicide, in my opinion.

In this immediate connection I will refer you to the interview with his sister, Mrs. Kresgy, because if the letter alone is suffi-cient, or if it warrants suspicions, they may be increased by what passed at the interview with Mrs. Kresgy, and now certainly by the occurrence which followed. Mrs. Kresgy was the widowed sister who had recently lost her husband, and on whom the deceased called on the Thursday before his death, and it was probably the interview before the last of the third part of the letter was begun,—certainly before they were finished. He called on this lady, and after some conversation about garden seed he began talking about the dreams of their parents,—having seen them in his dreams. He said he was going to New York to consult a physician in regard to his hearing. He said, it worried him so about his hearing, he was going to consult a doctor. He said he was going to New York, but, if something should happen to him, folks could help themselves. That visit, it is contended, indicates a purpose that he was in contemplation of an early death in connection with the intended visit to New York. He did not shed tears when he went away, and she says that after he got into the street he shed tears. Now, she said he often shed tears; that he was a very affectionate man; and that he had spoken of his parents, and of seeing them in a dream, and talked with them; and he said, going so often on a railroad, he was afraid of being hurt, on account of his deafness; advised about the husband's estate. The question is, gentlemen, whether anything in this interview amounted to a leave-taking? It has somewhat that tendency, apparently, but we might have heard the answer; that it is only from what we know afterward, a sort of after-born wisdom that makes us attribute importance to what may have been a mere ordinary occurrence; in its important relations I confess it has some bearing on the question.

But now, gentlemen, let us consider the occurrence which followed, because it may be that these occurrences are such that, compared with the letter and with the interview with Mrs. Kresgy, you may put them together and attribute a purpose that no one alone would satisfy you in attributing, and all of them together may remove a doubt that you might have as to any one in particular.

The occurrences which followed the letter, if they form the inferences of premeditated suicide, they certainly throw a great doubt upon the question of the firmness of any such resolution. This man is said to have been a religious person. He certainly was a man attentive to religious observances. Mr. Keeler, Mr. Bruler, and Mr. Hartwig describe him as an attendant both on Sunday and on week day, and at every service. He certainly, therefore, was a man observant of a respect due to religion, and the letter shows that he had a future state in his mind. He says: "If God calls me home, or away from mother."

Now, gentlemen, if he contemplated suicide, and I wish you to watch the evidence very

carefully as I proceed in review of it, in order and to determine whether he had any fixed purpose, whether it was a resolute determination or a floating thought, that he felt that he at times could not look the future in the face, and might or would probably commit suicide, or whether he had a fixed purpose to do it. He was not a man who without some proof you would expect to be willing to rush unqualified into the presence of the Almighty, as Blackstone says. You would not expect him to be free from the dread of something after death that puzzles the will. He was not the man to be wholly dull and indifferent to such considerations, or like the novelist who makes his hero fall off the monument to cheat the underwriters. He did not appear to be that sort of a man, but he appears to have been a man who did contemplate an early and violent death.

Now let us see what occurred after the night of Friday, at eight or nine o'clock. When he had finished a settlement he went home. He was at home by nine o'clock, or earlier, and he had his breakfast at an early hour, and soon after seven the next morning, in pursuance of his purpose which he had stated to Mrs. Kresgy and Squire Kruler, he got into the early train to go to New York. There is no other evidence of his purpose than that he had stated to these two witnesses, and you will say whether that might not have been a sufficient purpose to take him there. He arrived at New York at or soon after noon. It was then raining. He had no umbrella, and he said to Mr. Worman, who separated from him as they arrived, that he would buy an umbrella, and would return with him in the afternoon from New York. Accordingly, at half past five in the afternoon he came with his new umbrella, and he found Mr. Worman, and he accompanied Mr. Worman in the cars home again. Mr. Worman has related the conversation. Others have said that he was cheerful. He had made an appointment with Squire Kruler to go a day or two afterward in a sleigh to a neigh boring place where they had business to attend to, and in riding home in the cars there occurred a circumstance to which I attribute some importance. The train was detained thirteen minutes in the neighborhood of Easton, or South Easton, I think it is. Now, that thirteen minutes made him too late for the omnibus. In this good town of Bethlehem they don't do as they do any other place. Mr. Omnibus Man waits five minutes and says, "They are too late; I guess I'll go home," instead of waiting. Mr. Snyder knew this, for he said to Mr. Worman—Mr. Worman don't recollect whether it was before or after that detention at Easton, but this makes it probable it was afterward—he says to Worman, "I wonder if the omnibus will be there." Then you will observe a natural idea of the thirteen minutes' detention, and it turned out that the omnibus was not there, at Easton. It was a natural suggestion, and the words

"Are you going to your store? for I don't like passing those bridges at night." You will recollect that Conner got killed on that very bridge. Now, there was nothing more natural than that question, and the answer of Mr. Worman was that he was not going to his store, or he would have taken him (Mr. Snyder), but that he was going the other way, toward his house at South Bethlehem. Now, gentlemen, nothing can be more natural than that conversation, which the event verified because the omnibus in fact was not there when he got there. Now, if he meditated suicide, it would have been a great comfort to him to have somebody to go home with him to prevent it. From that conversation, in other words, if he did he was irresolute, and if there was any doubt about that, the doubt, I think, is removed upon the testimony of Mr. Wilson. Now, counsel have made an attack respectively upon these two witnesses which I do not see the reason of at all. They contradict each other in little, immaterial things, but they confirm each other in the substantial parts, which is that Mr. Snyder would have been very well satisfied to have had somebody to go home with him that night. If the omnibus was there, he would have gone in the omnibus and got home. If it was not there he would have gone with Worman, and he was not with Worman. Wilson's testimony is that they made an arrangement to meet the next day with a view to some business, and that the deceased man, Mr. Snyder, asked him to pass the night at his house. He asked Mr. Wilson to go and stay with him that night. Mr. Wilson declined, and when they parted Mr. Snyder took leave of Wilson in what they called the aisle, and that I think a church phrase, and when they got to what they called the aisle he repeated his invitation, and he said he had better go home and stay with him.

Now, gentlemen, this transaction indicated, you may think, that if he meditated suicide he would have been very glad for an excuse for not executing his purpose that night, in other words that there was irresolution and no fixed purpose, but that he would if he found himself alone. No omnibus, no companion, occurs to the thought of suicide as quite consistent. But we have been leaving the car on its arrival at Bethlehem thirteen or fifteen minutes behind, therefore losing the omnibus. We find him leaving the car on his homeward side, and there is evidence that he passed rapidly, as most persons do in front of the engine, and that two men were following him rapidly, as they would naturally do in front of the engine. I confess, gentlemen, I do not attach any materiality to that, but one of the witnesses says, what is probable, that the man in front was Mr. Snyder, and that is just what would occur, if he meditated suicide or not. I see nothing in that, either way. The counsel for the plaintiff thinks that these two men probably murdered him.

It may be so, but I attribute as little importance to the evidence on the other side, or to the assumed number of papers that he had to get rid of. I think that, on the contrary, these quite old people, and Lindeman, one of them, escorted a lady and gentleman to the "Eagle." I do not think there is much importance in what they say. I do not say on a dark night; the gas was then burning in one or two of the hotels; that did not prevent people from carrying lighted lanterns, you will recollect.

On the whole, therefore, we find him in a situation in which we would expect him to go home. Did he go home? He certainly never reached home. Now, where do we next find him? And here comes a different part of the case. You find him, if you believe Henry Billing—I see no reason why you should not; we shall think of that presently—we find him lying on his back on the footpath of the Lehigh bridge, apparently asleep, at five minutes before ten. Billing would seem to have been a stagnant sort of a person, but a very good man, apparently. Billing says he used to take a journey every evening to the end of the bridge to put the lights out, and that he put the further light out first, and that he found upon the bridge a man that he supposed to be a drunken man, toward the furthest part from the toll-house, and that is nearest to the depot, you know. He tried to wake him, and shook him gently, shook him harder, and got from him what the details are; that he got him up without much difficulty; and that the man said during this time, "I am stabbed, and stabbed twice;" that as he was getting him up he thought it was Monroe Snyder, and that when he got him up, and had the light thrown full in his face, he saw it was Monroe Snyder. In the meantime he told him what was very true: "You will be frozen to death." Snyder showed him the stabs. He could not see that he was stabbed, and he did not believe that he was stabbed, and that he then went his way, and put the light out, and coming back looked for Mr. Snyder. He was gone, and he went to the length of 150 feet to the next hotel, and could not see anything of him, and he then walked quickly back, and his daughter said in the meantime she had heard somebody go down the steps.

Now, Mr. Billing knew Mr. Snyder perfectly, and he says that when he last looked at him he was sure that it was Mr. Snyder. Is he to be believed? Why should he not be believed? Let us consider that a moment, if at that time his testimony was very seriously damaged, because he gave the following account of what occurred afterward. By the by, I forgot to mention that he said he went into the toll-house and told his wife and daughter what had happened, but he thinks nobody else: while he then says that he heard next morning that a man had been killed, and went down and took a look, but did not know who it was. He then went back, and soon after heard that it was Monroe Snyder, and he concluded that may be Snyder's friends would think that he ought to have looked to him, and that he would not say anything about it, and did not say anything about it. He thought they would blame him. But when he saw it was going to be a serious matter—he did not use these words, but that is what we may understand—he thought it was his duty to let Mr. Misch know. He went to Mr. Misch, and he told Mr. Misch, "I know something about it." That was very natural. And by Mr. Misch the subpœna was issued. Then he went to the inquest, and he found he was not wanted that afternoon, nor the next day, nor the day after. The present chief burgess, Mr. Irwin, sent for Mr. Billing, and he, Mr. Billing, found himself confronted with two New York detectives, and Mr. Irwin wanted him to tell those detectives all about it, and he said he would not give any statement except what he would give on oath before the coroner's inquest. On the whole, therefore, I cannot see what there is against this man's testimony, except the supposition of the witness as to what occurred before the New York detectives went upon this, what proved to be a hunt in the wrong place. If he did say it, it detracts somewhat from the accuracy of his evidence, and may have been in this respect mistaken. There was some carelessness about the date. It appears to me, however, that it would be very unsafe to reject or disregard in any way the testimony of Mr. Billing.

If it is true, then how stands this case? Can we mince this matter by speculations about going to church, or about anything else? Here was a man who should have been at home, and was found lying on his back with, as he said, wounds. If these were the wounds already inflicted, and he had lain down there to die, and got asleep and was likely to be frozen to death with the cold, how does that alter the aspect of the case, unless you believe that the wound had been inflicted by some person who had left. Now, Mr. Snyder, the deceased person, if that was the man on the bridge, did not make a long stay on the bridge. He went his way toward home, and he said, "I can go home," so Mr. Billing tells us, but independently of that what he did was the same thing as saying it; he went toward town. Here was then a man who, after more than half an hour, is found in this position, saying he was stabbed, moving toward home, and not reaching home. How does this present itself to your mind? How are you going to explain it? Do you believe that he had been wounded by men who had left him there? If so, you will adopt that theory, if you think it a rational one. If you believe what he said was untrue about the wounds, if he must have had some thought that he would not state—that is, therefore,

an explanation that diminishes the difficulty. Then he was wounded, as he said, able to walk, to go toward home, even though he might have been frozen to death and got to sleep after the wound. Why did he not reach home? What was the impediment?

Now, gentlemen, as to the evidence which follows. Its effect depends probably on what effect you attribute to Billing's testimony. As to the subsequent witnesses, I do not think that, in the absence of Billing's testimony, they sufficiently identify Mr. Snyder as the man who was seen, although I would leave that entirely to you as a matter of fact, but that the testimony of Mr. Billing, with the testimony which follows him, suffices entirely to convince you that Mr. Snyder, in a state of irresolution, unwilling to execute his purpose, hesitated, not content to go home, nor with firmness enough to take his life, was rambling and tumbling about in the dark at night. Now, if you take this theory as to that, and all that is a mistake—though you will decide upon that yourself—if he is the man referred to by the subsequent witnesses, then it is almost impossible not to look back to this letter, however obscure, and not to look back at Billing's testimony, not to look back to his interview with his sister, not to take a painful view of this occurrence. The buttoning of the clothes seems to me to be fully explained by Billing's testimony. You have heard a good deal about the clothes being found buttoned. He says the overcoat of Mr. Snyder was open; he cannot tell whether the undercoat was buttoned or not, but he raised his vest. You recollect the waistcoat, too, was on. Now, if Mr. Snyder, with the cuts which he said he had, if he had inflicted those cuts himself and he was able to walk off the bridge, he was able to button the coat, and the mystery ceases to be a mystery of which you have heard so much, and the same explanation can be made of his gloves. It was cold; he buttoned his coat and he put his gloves on. That part of the subsequent examination of the case seems to me to be explained, and to be attended with no mystery at all, if you give full effect to Billing's testimony.

Now, was he seen afterward? Did he remain on that bridge without going home, or was he dead, or soon after murdered by one or more unknown men, or the same men who crossed after him in front of the engine, or some other man or men, or by some man who was heard talking to another about how to divide some money, or any of these suggested facts? Why, gentlemen, if Billing's testimony is true, it requires a great deal of self-possession to comprehend how this man was not taking care of himself, and why he did not go home, and so forth. Now I get right. Now I will go back and recur to Fetter's testimony. Fetter was going to the hotel after 11 o'clock, and he saw a man whose actions frightened him, and well they might. Mr. Fetter says that between 11 and a quarter past 11 he passed down Main street on the sidewalk on the west side of the way. "Did you see anybody on or near Monocacy bridge? Answer. I did, going down the plank walk, all by himself. I passed the man just far enough"—then occurs a blank in my notes—"I saw it was a man going across slowly; I was going pretty fast myself; I could not very well tell whether he was standing or moving; as I neared him I saw he was going from me. I slackened my pace; he was about as far as across the room on the bridge, his back to me, and walking slowly." Now, gentlemen, this evidence certainly, in the absence of Billing's testimony, and the testimony which follows of the three men at a later hour, would be very unsatisfactory; in fact I should advise you to consider it no identification at all; however probable it might be, it would be but probable. But we come to a later hour, when there is something more like identification. There is a man whose name is Sceitzer, or Schreiner,—it does not matter,—who was engaged in the zinc works, and who was walking home after two o'clock at night, and Bush and Barr, who you recollect were one of them going home in a sleigh, and the other one walking. This sewing machine man, Swifel, so Bush, also, says he saw a pretty tall man walking in front of him toward the Monocacy bridge. He describes his size and walk, and says the man was not black, that he was a white man, and he saw him all the way from Fetter's Hotel to the Monocacy bridge.

The testimony of these two witnesses, without Mr. Billing's, would amount to very little; but the same man whom they saw was seen by Billing, and to his testimony more attention is due,—that he recognized this person as some one he thought he knew, and resembled Monroe Snyder, whom he did know. He says, "I recognized the person as some one whom I knew, and resembling Monroe Snyder, whom I knew." He then describes him. He says it was a pretty cold night. A few minutes after starting the man passed on ahead of him, and "I started off; passed Fetter's residence; I saw a person on the Monocacy bridge, on the south side, about twenty feet from the south end of the bridge; when I first saw him he was leaning in this position; I myself was in doubt: I suppose he recognized me; he turned and walked toward me; I stopped; went on fast; walked to say within a foot of the person. When I first saw him he was going north; he came to a standstill; he was facing me; as soon as I saw I could have my place, the place that I wanted, I stopped; looking around over my shoulder, I saw the man standing pretty much where I left him. I passed up the street and went home. I recognized the person as the same one I thought I knew; he resembled Monroe Snyder, whom I knew." The remaining testimony is not important.

Now, gentlemen, I think this is sufficient

identification for us, if it is to be considered by you for what it is worth; if Billing tells the truth, and, as I said, I see no reason why we should disbelieve him; and if Monroe Snyder, as is unquestionable, never got home, and a man is seen by these three persons in this attitude, and with such means, whose figure resembles Monroe Snyder, with Billing's testimony, and the fact that he had not got home, there is not much evidence, if it satisfies you, of identification for your consideration. I do not state that as a matter of law, but as a matter of common sense, for what you think it goes. So, then, this man roamed about in the darkness of this night until after two o'clock. Was that Monroe Snyder? Had he, before or after he was with Billing, stabbed or attempted to stab himself? Had he passed or crossed the bridge without going to his house? Had he thus been on the bridge? If so, there is evidence tending strongly to prove that he was meditating suicide; that he was irresolute; that he could not bring himself to carry his purpose into effect; that for the want of an instrument to stab himself he could not stab deep enough; that if he meant anything else he could not execute his purpose; in short, he was very irresolute.

Now, gentlemen, it does not do to theorize about what may have occurred. If we can find any other rational view of the case, it would be very irrational to say that he had been all this time meditating suicide. He nevertheless might have been afterward murdered and thrown over, but if you can find any other way of reconciling evidence, as I said before, probabilities are not facts. If he was the same man, as the defense alleges, thus roaming about, he certainly had not had courage enough to execute his purpose; however, you may believe that he meditated it. I do not say that we have any other light upon this case to guide us until we come back to what we first considered of the place where the body was. Before we come to that, however, I would say this to you, that if you believe he meditated suicide, whether he formed that resolution after the cars had been detained at Easton, or had formed it as long before as forty-eight hours, when he was conversing with Mrs. Kresgy, some earlier time, when he was writing this paper for his son, for I say, if you find that he meditated suicide, then I would advise you to attribute his death to the purpose he had formed, if you can reconcile the way the body was found with suicide. But observe, you must be convinced that he meditated suicide, and that the position of the body was consistent with the commission of suicide. If on the contrary, gentlemen, you doubt his identification by Billing, if you disregard this loose identification which followed, if you think the writing and the interview with Mrs. Kresgy can be reconciled with a more natural and more innocent purpose, why then there is no trouble in your verdict; but sup-

posing that you cannot get over these things; supposing that he did meditate suicide; then let us recur to the crisis: how did the body get where it was found? Could it have reached the position where it was found without some other human agency than that of the deceased man himself? Now it is not for me to pass over that part of the case after the long delay I have subjected you to. You have heard all about it. You have heard the arguments there are about the idea. You have perceived already that a murderer would throw a man over, intending to kill him from that height, is by no means an impossibility. That a man, himself, should form that idea, intending to commit suicide, deserves some consideration. If he happened to fall on his head it would do very completely. It is for you to say whether there would not be more than that blood on the hat, and whether his skull would not be dashed to pieces; but he might not have fallen on his head. It is not like a man on the monument that Dickens wrote about in that flippant way I have indicated. Might he not at least have broken his arms or legs and saved his life, and not been killed by it? Did he choose that mode of death, therefore, if he wanted to commit suicide? You cannot say that he did not; but did he? The fact is evident, the body was found; but is it found where it would have been consistent with such a purpose? And if you find the purpose executed you might get over the difficulty; but if you find that the body could not be where it was without some other human agency than his own, have the defendants succeeded in proving suicide? The burden of proof is on them. I don't bring it beyond any unmanly doubt; I mean within a reasonable ground. Have they failed in the affirmative issue which they have taken upon themselves? And I advise you to take the theory of suicide and look at that ground, remembering the testimony of Mr. Leer and the others, attributing such effect as you think right to the footsteps; but, as I think more important, looking at the positions, you cannot mistake the nature of the question.

If you think that that man could have got to the place where his body was found without some other human agency, then your verdict should be, I think, for the defendant. If you find from the evidence that he meditated suicide, I don't say that as a matter of law, but as a rational conclusion from the evidence; or if you find the contrary—(and I don't know how far a man of fifty can jump, but I believe nine feet is a pretty good jump; we young men think thirteen feet a pretty good long one—you can take into consideration these measures; but as far as a man could jump, he would fall short of it. There would be a curve inward before he could get to the ground, and if you think he could have got, by his own jump, more than six feet, then his body was found twenty odd feet from the bridge, as I under-

stand the evidence. Could he have got there?)—if you think, further, that he could not have been where he was found without some other human agency, then it would be forcing things to say that he committed suicide and murder both, or that he attempted suicide and was afterward murdered and dragged to the place where he was found. These are fancies which you will hardly entertain. Now, gentlemen, there is no apology at all for the time I have taken, because, if I can save you trouble, I shall be glad to have done it. I leave that part of the case. You understand what the question is, and you will say whether you find that Monroe Snyder died by his own act or not. I come now to some similar questions in the case; they all grow out of one fact. It seems that in the year 1867, I think when Mr. Snyder was the agent for the salt company, he was either loading or unloading a wagon at a railway car, and he fell and struck his head against the wall or ground (it does not matter,) and was stunned for some minutes. He had a bump on his head; I think that is the whole evidence; but whether he was able to get into his carriage is for you. His son had come to drive him home in the meantime. The railway company, being very properly vigilant, as a matter out of which lawsuits might arise, sent for their physician, who arrived in time to see him get into his carriage. Mr. Snyder seems to have allowed the physician to make six calls at the expense of the railroad company; but the physician says he did not find anything particular the matter with him, and did not recollect giving him anything but nitre. It was not in evidence that he took to his bed at all, and in a few days he was quite well. As to the point of law, I will instruct you, that if Mr. Snyder accepted the services of the physician, he ratified the employment of him by the railroad company, and it was the same thing in law as if he employed him himself; but it is not evident that it was the same thing in fact. As to the seriousness of the injury, that is for you to consider. It is the same thing in law, as to the question of employing a physician; of the seriousness of the injury; to this matter you will give such effect as you may think due to it. Now, in the post mortem examination, it was found that there had been a slight adhesion, probably at the place where he got this bump. That adhesion, the surgeon told you, would have occurred from a very slight injury that would not have made him unsound. If I understand the testimony rightly, that is about the whole of the case.

Gentlemen, upon these simple facts four legal propositions are put to me:

First. The written applications as made by the insured, dated respectively July 9th, 1872, and the subsequent September 18th and January 10th, 1873, constituted the basis of contract of insurance, and Monroe Snyder in answer to that part of the question in No. 13, in which it says, "Have you ever had a disease or any other attack?" answered, "Smallpox, thirty years since." But you have the uncontradicted testimony that Monroe Snyder had a severe fall on his head on the 9th day of December, 1867. The answer to this part of the question, No. 13, in the application for which the policies are sued, is untrue, and the plaintiff cannot recover the said policies.

I answer, if the jury find that the fall on his head was a severe one, or that it injuriously affected any vital part, the verdict in this case should be for the defendant.

Second. The written application for the policies signed by Monroe Snyder, the insured, on July 9th, 1872, September 18th, 1872, and January 10th, 1873, form the basis of the contract for the insurance of Monroe Snyder, and he having, in answer to the question No. 14, contained in application: "Have you ever had any serious illness, disease, or personal injury?" answered, "Smallpox, thirty years since," and the testimony uncontradicted is that on the 9th day of December, 1867, Monroe Snyder had a severe concussion of the brain, the answers of Monroe Snyder are untrue, and that the plaintiff is not entitled to recover on any of the policies sued on.

Answer. If the jury find the concussion of the brain a severe one, the verdict in such case should be for the defendant.

Third. A severe fall, by which the head is struck, resulting in concussion of the brain, is a severe personal injury, within the meaning of the term used in the several applications signed by the insured.

Answer. If the jury find that the blow by which the head was struck was a severe one, resulting in concussion of the brain, it was a severe personal injury, within the meaning of the term within the several applications.

Fourth. If the written applications, bearing date September 18th, July 9th, 1872, and January 10th, 1873, signed by the insured, form the basis of the contract of insurance, and the policies were issued upon the express condition and agreement that if any of the statements and declarations made in the applications be different, or in any respect untrue, then the policies should be respectively null and void, and Monroe Snyder, in the insured, having in answer to question seventeen in the said policies, which is, "How long since you were attended by any physician, and for what disease? Give name and residence of such physician," answered, "Not for twenty years;" well, the testimony is unimpeached and uncontradicted that Monroe Snyder was, in the month of December, attended several times by a physician for a severe fall upon his head, this answer is untrue, and the policies are thereby rendered void, and the plaintiff cannot recover upon them.

To that I answer, that if the fall upon the

head for which Monroe Snyder was attended by a physician was a severe one the answer in such case was untrue, and the verdict in such case should be for the defendant. It is not contended that every bump on a man's head, received from a fall, is enough to induce an affirmative answer to these questions: but I leave it for you, whether you think so, as the questions imply.

The case is with you, gentlemen.

Verdict for plaintiff for amount of policy, with interest.

[On writ of error the judgment of this court was affirmed by the supreme court. 93 U. S. 393.]